IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

UNITED STATES OF AMERICA,

        Plaintiff,

v.                              No. 07-40090-01-SAC

RICHARD ODEL NEELEY, JR.,

        Defendant.

MEMORANDUM AND ORDER

        This case comes before the court on defendant's motion to dismiss one count of the indictment, and defendant's motion to suppress evidence. The government opposes both motions.

        Defendant is charged by indictment with three counts based on incidents alleged to have occurred on June 5, 2007: Count 1 - possessing with intent to distribute Ecstacy, containing MDMA, a controlled substance; Count 2 - possessing a firearm during and in relation to a drug trafficking crime; and, Count 3 - being a felon in possession of a firearm.

**Motion to Dismiss**

        Defendant contends that Count 3 of the indictment, which alleges that defendant is a felon in possession of a firearm, should be dismissed for the

government's inability to prove the underlying felony conviction. It is undisputed that a prior conviction is an element of this count, and must be proved by the government. *See U.S. v. Stober* , 604 F.2d 1274, 1277 (10th Cir. 1979). Defendant contends that he has no prior conviction because the state proceeding referenced in the indictment as the basis for defendant's prior felony was merely a "deferred judgment" which, under Oklahoma law, fails to constitute a "conviction."

Count 3 of the indictment states:

On or about the 5th day of June, 2007, in the District of Kansas, the defendant…having been convicted of a crime punishable by imprisonment for a term exceeding one year, to wit: on January 10, 2007, defendant was convicted of possession of cocaine base, in violation of 63 O.S. 2-401 - 2-420, a felony, in the District Court of Oklahoma County, Oklahoma, case number CF-2006-6948, did knowingly possess in and affecting commerce a firearm, to wit: a Glock, Inc. Model 22, .40 caliber semi-automatic pistol, bearing serial number FYK288, which had been shipped and transported in interstate and/or foreign commerce, in violation of Title 18, United States Code, Sections 922(g)(1) and 924(a)(2).

Dk. 1.

The relevant federal firearm statute provides:

g) It shall be unlawful for any person--
(1) who has been convicted in any court of, a crime punishable by imprisonment for a term exceeding one year; ...
to ship or transport in interstate or foreign commerce, or possess in or affecting commerce, any firearm or ammunition; or to receive any firearm or ammunition which has been shipped or transported in interstate or foreign commerce.

18 U.S.C.A. § 922(g).

The phrase "crime punishable by imprisonment for a term exceeding one year" is defined in § 921(a)(20), which provides, in relevant part:

> What constitutes a conviction of such a crime shall be determined in accordance with the law of the jurisdiction in which the proceedings were held. Any conviction which has been expunged, or set aside or for which a person has been pardoned or has had civil rights restored shall not be considered a conviction for purposes of this chapter, unless such pardon, expungement, or restoration of civil rights expressly provides that the person may not ship, transport, possess, or receive firearms.

18 U.S.C.A. § 921(a)(20). Accordingly, the decision whether defendant's prior Oklahoma court proceeding resulted in a qualifying "conviction" for purposes of this statute must be based upon Oklahoma law.

The government's argument that federal law should control is based upon old case law which has effectively been superseded by the statutory language quoted above. *See Dickerson v. New Banner Inst. Inc*., 460 U.S. 103,111-12 (1983) (applying federal law to hold that a plea of guilty to a state offense punishable by imprisonment of more than one year, followed by a successfully served probation term and the expunction of the defendant's record, nonetheless constitutes a conviction for purposes of 18 U.S.C. § 922(g), (h)); *U.S. v. Pennon*, 816 F.2d 527, 529 (10th Cir. 1987) (finding a defendant who received a deferred judgment and term of probation prior to 1986 satisfied the felony conviction requirement of 1202(a)(1) (possession of firearm after having been previously

convicted of felony).  *Pennon* noted that Congress consolidated the federal gun

control statutes in 1986 by repealing section 1202 and by amending section 922(g),

such that "Congress' decision to adopt expressly the states' definitions of what

constitutes a conviction effectively overrules *Dickerson*." 816 F.2d at 529. Thus for

crimes committed post-1986 when Congress amended § 921(a)(20)'s definition of

predicate offenses, state law defines what constitutes a predicate conviction.  *See*

Firearms Owners' Protection Act of 1986, Pub.L. No. 99-308, § 101(5), 100 Stat.

449 (1986).

The court similarly rejects the government's contention that Tenth

Circuit law interpreting § 4A1.1(d) of the federal Sentencing Guidelines should

control.  Federal sentencing is a matter peculiarly within the province of the federal

court, and the sentencing guidelines, which are a creature of a federal commission,

are properly interpreted by reference to federal law.  Additionally, the language of

the USSG, which adds two points if the defendant committed the instant offense

while under "any criminal justice sentence, including probation, parole, supervised

release…," is significantly broader than the language of the felon in possession of a

firearm statute, which requires that defendant be "convicted of a crime punishable

by imprisonment for a term exceeding one year."   Accordingly, the court finds

*U.S. v. Vela*, 992 F.2d 1116, 1117 (10th Cir. 1993) (finding a deferred sentence in

Oklahoma to be a criminal justice sentence within the meaning of section

4A1.1(d)), and like cases, to be distinguishable.

In accordance with the dictate of 18 U.S.C.A. § 921(a)(20), the Court

looks to the state law of Oklahoma to determine whether defendant's deferred

judgment in Oklahoma for possession of cocaine base constitutes a "conviction"

within the meaning of that term in 922(g)(1). The Oklahoma deferred judgment

statute provides:

> A. Upon a verdict or plea of guilty or upon a plea of nolo contendere, but before a judgment of guilt, the court may, without entering a judgment of guilt and with the consent of the defendant, defer further proceedings upon the specific conditions prescribed by the court not to exceed a five-year period.  The court shall first consider restitution among the various conditions it may prescribe.
> …
> C. Upon completion of the conditions of the deferred judgment, and upon a finding by the court that the conditions have been met and all fines, fees, and monetary assessments have been paid as ordered, the defendant shall be discharged without a court judgment of guilt, and the court shall order the verdict or plea of guilty or plea of nolo contendere to be expunged from the record and the charge shall be dismissed with prejudice to any further action….

22 Okl.St.Ann. § 991c.

Under this law, a deferred sentence generally entails "a probationary

period of up to five years after which, if the accused has complied with the rules

and conditions of probation, the case is dismissed without a criminal conviction

and the record is expunged…" *Hammon v. Ward*, 466 F.3d 919, 923 n. 4 (10th Cir.

5

2006). As explained by the Oklahoma Court of Criminal Appeals, in such a matter, "the [trial] court retains jurisdiction and only a conditional order, not a judgment and sentence, is entered." *Nguyen v. State*, 772 P.2d 401, 403 (Okla.Crim.App.1989), overruled on other grounds by *Gonseth v. State*, 871 P.2d 51, 54 (Okla.Crim.App.1994).

Thus under Oklahoma law, a deferred sentence generally "is not a conviction until such time as the trial court pronounces judgment and sentence." *Belle v. State*, 516 P.2d 551, 552 (Okla. Crim. App.1973). *See Crews v. Shelter General Ins. Co.*, 393 F. Supp.2d 1170, 1176 (W.D. Okla. 2005); *U.S. v. Turner*, 497 F.2d 406, 407 (10th Cir.1974); *U.S. v. Stober*, 604 F.2d 1274 (10th Cir. 1979) (holding that defendant who had pled guilty in Oklahoma state court pursuant to the Oklahoma Deferred Judgment Act had not been "convicted" in the Oklahoma proceedings for purposes of U.S.C. § 922(h) prohibiting the receipt of a firearm by one who has been convicted of a felony); *United States v. Parker*, 604 F.2d 1327, 1329 (10th Cir.1979)(holding the felony conviction requirement of section 1202(a)(1) was not satisfied because Oklahoma courts did not view the deferred judgment as a conviction). Accordingly, under the general rule, a defendant subject to a deferred sentence in Oklahoma, for whom judgment has not yet been entered and sentence has not yet been imposed, has not "been convicted" of a felony for

6

purposes of Section 922(g)(1).

Nonetheless, the court's review of Oklahoma statutes shows that the general rule is inapplicable in this case. Defendant's Oklahoma deferred judgment for possession of a controlled substance is subject to an exception set forth in Oklahoma's Controlled Dangerous Substances Act. That Act specifically states that a plea of guilty or finding of guilt shall "constitute a conviction of the offense for the purpose of this act or any other criminal statute under which the existence of a prior conviction is relevant." 63 Okl. St. Ann. § 2-410. The relevant statute states:

§ 2-410. *Conditional discharge for possession as first offense*
Whenever any person who has not previously been convicted of any offense under this act [FN1] or under any statute of the United States or of any state relating to narcotic drugs, marihuana, or stimulant, depressant, or hallucinogenic drugs, pleads guilty to or is found guilty of possession of a controlled dangerous substance under Section 2-402, the court may, without entering a judgment of guilt and with the consent of such person, defer further proceedings and place him on probation upon such reasonable terms and conditions as it may require including the requirement that such person cooperate in a treatment and rehabilitation program of a state-supported or state-approved facility, if available.
…
Any expunged arrest or conviction shall not thereafter be regarded as an arrest or conviction for purposes of employment, civil rights, or any statute, regulation, license, questionnaire or any other public or private purpose; *provided, that, any such plea of guilty or finding of guilt shall constitute a conviction of the offense for the purpose of this act or any other criminal statute under which the existence of a prior conviction is relevant.*

63 Okl.St.Ann. § 2-410 (emphasis added).

7

Under the Oklahoma statutory scheme, "the only deferred sentence which may be considered a prior conviction for purposes of the Uniform Controlled Dangerous Substance Act... or other relevant criminal statutes is a deferred sentence arising out of a plea of guilty or a finding of guilt in a criminal action brought under § 2-402 of said act." *Hefner*, 542 P.2d at 531; *See State ex rel. Macy v. Owen*, 717 P.2d 1141, 1143 (Okl.Cr.1985) (finding a defendant who previously completed a deferred sentence but had been adjudicated guilty of a drug-related offense was "convicted," rendering him ineligible for a suspended sentence).  *See generally State v. Bridwell*, 592 P.2d 520, 524 (Okl. 1979) (finding that the term "conviction" cannot be given a precise definition, that its meaning must be derived from the intention of the legislature as disclosed by the provisions of the statute, and that a conviction may be final for one purpose and not for another.)

The indictment in the present case alleges that defendant was convicted of possession of cocaine base pursuant to statutes including § 2-402 of the Oklahoma Controlled Dangerous Substances Act.  Government's Exhibit 2, a certified copy of defendant's Oklahoma disposition, evidences that defendant entered a pleas of guilty to one count of possession of cocaine in violation of § 2-402 of the Oklahoma Controlled Dangerous Substances Act and to one count of possession of drug paraphernalia in violation of § 2-405 of that Act.  These are the

underlying convictions referenced in the indictment. Because of the express language of 63 Okl. St. Ann. § 2-410, the government will most likely be able to meet its burden to prove that defendant has "been convicted" of a felony for purposes of § 922(g)(1), despite the fact defendant is currently subject to deferred judgment in Oklahoma. Defendant's motion to dismiss shall therefore be denied.

**Motion to suppress**

Defendant seeks to suppress incriminatory evidence found in his vehicle,[1] contending that he was illegally stopped and illegally detained, and contends that his subsequent statements are barred under the fruit of the poisonous tree doctrine. An evidentiary hearing was held on this issue on November 28, 2007, at which time the court took the matter under advisement. The sole testimony presented at the hearing was by Trooper Shawn Taylor, a three and one-half year employee of the Kansas Highway Patrol. The court finds his testimony to be credible and consistent in all material respects.

**Facts**

On June 5, 2007, at approximately 12:15 p.m., Trooper Taylor of the Kansas Highway Patrol was patrolling southbound on I-35 when he observed a

---

[1]The court refers to the vehicle as defendant's for purposes of convenience, fully recognizing that it was not owned or driven by defendant at the time of the stop.

black Chevy truck with a Missouri plate northbound on the highway.  Defendant

was a passenger in this vehicle. Trooper Taylor's attention was first drawn to the

vehicle because he observed the driver "very slouched down in the driver's seat."

Although Trooper Taylor admitted it is not unusual for young men to slouch in

their seats while driving, the slouching nonetheless seemed "out of the ordinary" to

him and caused him to believe that the driver may be tired or under the influence of

alcohol or drugs. Trooper Taylor crossed through the median, turned around, and

followed the truck.  As he followed[2] the truck for approximately four miles he saw

it cross the fog line on the right shoulder "several times," or three times, which he

believed posed a safety concern.  Trooper Taylor observed no other vehicles

crossing the fog line, as he would have expected had there been an external

contributing factor such as weather, road or traffic conditions.  He then stopped the

vehicle.

> Trooper Taylor testified that at the time of the stop, the weather was

sunny and clear, the wind was unremarkable, the traffic was very light, the road

conditions in the area of the stop were normal and had no obstructions, serious

potholes or construction. There was a gradual curve in the road and there were

---

[2]No testimony was offered to show the distance between Trooper Taylor, while following, and defendant's vehicle, or whether other vehicles were in between them, or at what point defendant appeared to notice his presence behind him.

some small hills, but nothing in the weather, traffic patterns, or road conditions affected Trooper Taylor's ability to maintain a single lane. Trooper Taylor knew of no reason attributable to the weather, traffic, or road conditions that could reasonably have affected another driver's ability to maintain a single lane.

Trooper Taylor explained to the occupants that he had stopped the vehicle for failing to maintain a lane "several times." [3] Neither occupant protested that they had not committed that offense. He then asked the driver, Bruce Baker, whether he had been drinking or was tired, and received a negative response. When the trooper  asked for his driver's license and rental agreement, driver Baker responded that he did not have his license with him, and produced an Oklahoma identification card which did not entitle him to driving privileges.  Defendant, the passenger, produced a valid Kansas driver's license. The rental agreement was in defendant's name, with an address of West 99th Street, Lenexa, KS. The rental agreement (Government's Exh. 3) showed that defendant had rented the vehicle at Overland Park, KS., on June 1, 2007, at 9:47 a.m., and that it was due to be returned on June 4, 2007, at 11:00 a.m. Thus, the vehicle was already over 24 hours overdue.

---

[3]The exact verb the Trooper initially used to describe the traffic offense to defendant and the driver is not intelligible on the video tape of the stop. Government's Exh. 1. Whether he said he stopped the vehicle for hitting, touching, crossing, or going over the line several times is unclear, but is immaterial to the court's decision in this case.

Baker complied with the trooper's request to accompany him to his patrol car and submitted to a pat down for weapons.  Once there, Trooper Taylor observed that Baker was "breathing very heavily," was "visibly shaking," and "repeatedly wiped his hands" on his shorts as if they were sweaty.  These actions were similar to those Trooper Taylor had observed during other stops in which criminal activity had been discovered, and led Trooper Taylor to believe that Baker was "very nervous," and was possibly being deceptive.

Trooper Taylor asked Baker where they were coming from. Baker said that they were coming from Oklahoma, where he was originally from, and were visiting family. Baker said that defendant had picked him up in Oklahoma, and that he had originally taken a bus to Houston and then went to Oklahoma. Trooper Taylor characterized the travel plans related by Baker as "vague." Baker also stated that he had come to Kansas with defendant because defendant was helping him get his commercial driver's license. Trooper Taylor thought this was odd because he knew that a person cannot get a commercial driver's license without having a valid driver's license. KHP Dispatch had advised Trooper Taylor that Baker's driver's license was suspended through the state of Oklahoma.  At this point, Trooper Taylor became suspicious that some criminal activity may be afoot.

Trooper Taylor then returned to the truck to ask defendant about their

12

travel plans. Defendant advised Trooper Taylor that they had gone to Dallas, Galveston, Houston, and Oklahoma City for funerals. Defendant produced a magazine which contained a pamphlet with a picture of what appeared to be that of a deceased woman, dated March of 2007.  Trooper Taylor found this odd because defendant stated they had only been gone for a few days and he had never known a person to be buried so long after the date of death. He additionally found it unusual that defendant had been to more than one funeral in one trip within the short time period reflected on the rental agreement.

Trooper Taylor asked defendant what they had done in Oklahoma City. Defendant repeated that they had gone to a funeral and had visited the family. Trooper Taylor asked for the address, but defendant was unable to provide an answer.  When Trooper Taylor asked defendant a question, defendant's pattern was to partially or completely repeat the question and then think for a few seconds before answering, as if he were trying to make up answers.  Based on Trooper Taylor's training and experience, he believed that defendant exhibited signs of deceptive behavior in his demeanor and his substantive responses.

Trooper Taylor returned to his patrol car and asked Baker again what they had done while in Oklahoma, and if there was anything specific they had attended. Baker made no mention of any funeral and again said they had visited

13

family.  Trooper Taylor returned Baker's documents, handed him a warning, and explained that Baker could not drive without a valid license.  Trooper Taylor told Baker that was all he had for him, and that he could exit his patrol car while he returned defendant's license and the vehicle rental agreement.  Trooper Taylor then approached the passenger side window of the truck and told defendant that his cousin could not drive, but that they were free to go. Defendant said that they would switch spots and exited the truck.  Trooper Taylor broke contact with the two men and then walked toward his patrol car.

While both men were outside the truck, Trooper Taylor re-initiated contact by asking defendant if he could speak with him some more.  After receiving a positive response, Trooper Taylor asked defendant if he understood that he was free to go, and defendant stated yes.  Trooper Taylor explained to defendant that there was a problem on I-35 with illegal narcotics, guns, and such being transported down the interstate, and asked if he had anything like that in the truck. Defendant stated no, nothing but cough syrup. Trooper Taylor then asked if he could search the truck, and defendant stated yes.[4] Defendant was patted down for weapons and stood in a safe place away from traffic while the search was being conducted.

Trooper Taylor and a back-up officer began to search the interior of the

---

[4]Defendant does not challenge his consent in any manner other than as fruit of the poisonous tree.

14

truck. Trooper Taylor noticed that the interior of the truck had a lived-in appearance, with trash and food wrappers on the floor.  The amount of trash led Trooper Taylor to believe that it was an "accumulation of days of trash," typical of non-stop travel, which he found to be suspicious.

Trooper Taylor opened the center console located between the two seats and noticed some money and a bottle of prescription cough syrup with the patient's name portion of the label torn off.  Trooper Taylor then removed the keys from the ignition and unlocked the lower part of the center console. There he saw the grip frame of what he recognized to be a handgun, and a plastic bag containing various colored pills which the trooper thought were illegal drugs. Baker and defendant were then arrested.  Trooper Taylor issued Miranda warnings to defendant and asked him some questions to which defendant made incriminatory responses.

Upon further investigation of the plastic bag containing the pills, Trooper Taylor found that they were wrapped in four smaller plastic bags and were in an assortment of colors. Trooper Taylor recognized the pills as Ecstacy. While Trooper Taylor was transporting defendant to the Osage County Jail, Defendant adamantly asserted that the pills were his and that they were for his personal use.  Defendant said that his cousin had no knowledge of the drugs or gun,

and was just getting a ride back to Kansas City for a job he was helping him with.

Task Force Officer (TFO) Brent Hogelin of the Kansas City Interdiction Task Force subsequently interviewed defendant, after defendant again received Miranda warnings, and received statements consistent with those defendant had made to Trooper Taylor.

Defendant's motion to suppress alleges an illegal initial stop and an extended detention. Defendant seeks suppression of the items seized and his subsequent statements as fruits of the poisonous tree.

**Initial Stop**

To lawfully initiate a traffic stop, "the detaining officer must have an objectively reasonable articulable suspicion that a traffic violation has occurred or is occurring." *United States v. Soto*, 988 F.2d 1548, 1554 (10th Cir.1993). The constitutionality of an initial stop depends upon whether the detaining officer "had reasonable suspicion that this particular motorist violated any one of the multitude of applicable traffic and equipment regulations of the jurisdiction." *United States v. Botero-Ospina*, 71 F.3d 783, 787 (10th Cir. 1995) (en banc) (internal quotation marks omitted).

Defendant contend that Trooper Taylor lacked reasonable suspicion to stop defendant's vehicle for violating K.S.A. § 8-1522(a), which provides:

16

> [w]henever any roadway has been divided into two (2) or more clearly
> marked lanes for traffic, .... [a] vehicle shall be driven as nearly as practicable
> entirely within a single lane and shall not be moved from such lane until the
> driver has first ascertained that such movement can be made with safety.

Defendant does not dispute that his vehicle touched the fog line several times in several miles, but relies upon *State v. Ross,* 149 P.3d 876, 879 (Can. Ct. App. 2007), in hopes of casting upon the government the burden to prove that defendant's actions were unsafe.

Defendant's reliance upon *Ross* is misplaced, as this court explained in *United States v. Jones*, 512 F. Supp. 2d 1193 (D. Kan. Aug. 7, 2007), a case in which this court thoroughly examined the relevant statute under similar claims. *Jones* held that drifting out of a lane just once would provide reasonable suspicion when under the circumstances "the driver could reasonably be expected to maintain a straight course at that time in that vehicle on that roadway." *Id.* It also found that the Tenth Circuit has not read an "unsafe movement" element into § 8-1522, but had recognized reasonable suspicion of a § 8-1522(a) violation if from the circumstances the officer could infer that the driver did not purposely move out of the lane and, thereby, failed to first ascertain the safety of the departure. 2007 WL 2258451 at *10.

Recent cases confirm this court's approach in *Jones*. *See e.g., United States v. Egan*,  No. 06-3426, 2007 WL 4179083 (10th Cir. Nov. 27, 2007); *United*

17

*States v. Brown*, No. 05-3400, 2007 WL 1241646 *6 (10th Cir. 2007); *State v.*

*Marx*, __ Kan. App. __ , 2007 WL 3119440 (Oct. 26, 2007).  In the latter case, one

panel of the Kansas Court of Appeals declined to follow *Ross's* interpretation of

K.S.A. 8-1522, written by another panel of that same court.  *Marx* then succinctly

summarized K.S.A. 8-1552's elements by stating:

> We interpret K.S.A. 8-152 to mean that a vehicle shall be driven as
> nearly as practicable entirely within a single lane of traffic.  The "nearly as
> practicable" language allows a driver to momentarily move outside a lane of
> traffic due to special circumstances such as weather conditions or an obstacle
> in the road.  Otherwise, the driver must stay in one lane.  The statute further
> provides that if a driver intentionally decides to move his or her vehicle from
> its lane of traffic, the driver must first ascertain that such movement can be
> made with safety.

*Marx*, 2007 WL 3119440 *8 .

Older cases have consistently found reasonable suspicion under similar

circumstances, applying the general rule that:

> an officer's observation of a vehicle straying out of its lane multiple times
> over a short distance creates reasonable suspicion that the driver violated
> Kan. Stat. Ann.  § 8-1522(a) so long as the strays could not be explained by
> adverse physical conditions such as the state of the road, the weather, or the
> conduct of law enforcement.  *United States v. Cline*, 349 F.3d 1276, 1287
> (10th Cir. 2003); *United States v. Zabala*, 346 F.3d 1255, 1258-89 (10th Cir.
> 2003); *Ozbirn*, 189 F.3d at 1198.

*Egan*, 2007 WL 4179083 *4.  Thus when a vehicle strays from its lane several

times in a short distance without apparent justification, "an officer may reasonably

suspect that the driver did not purposely move out of the lane and, thereby, failed to

18

first ascertain that one or more of those departures could be 'made with safety,' " in violation of the statute. *Id.*

For purposes of a suppression hearing, the defendant bears the burden to show the existence of a "special circumstance" justifying his departure from the general rule of lane maintenance in K.S.A. § 8-1522. *Marx*, 2007 WL 3119440 *8. Although the government is not required to prove a negative, it has succeeded in so doing in this case. There is no evidence that Baker departed from his lane in response to an apparent hazard in the highway, or adverse weather or physical conditions, or traffic conditions, or any other "special circumstance." *Marx*, 2007 WL 3119440 *8. There is no evidence that Baker used his turn signal before crossing the fog line several times, or other evidence that he actually intended to move from his lane of traffic. Instead, the government has affirmatively shown that there were no special circumstances present at the time and place of defendant's stop which could have caused a reasonable driver to deviate from his lane of travel. Accordingly, Trooper Taylor had reasonable suspicion to believe that Baker moved out of his lane of travel without first ascertaining whether he could do so safely, in violation of K.S.A. § 8-1522(a).

**Detention**

Defendant additionally contends that his detention was unreasonably

19

long and that the trooper asked questions unrelated to the purpose of the stop. Trooper Taylor testified that the length of the stop was standard and that there was no intentional delay on his part.  The video tape reveals that the total length of the detention, from the initial stop to the trooper's telling defendant he was free to go, was approximately 16 minutes.

Although a traffic stop can become unlawful if it is prolonged beyond the time reasonably required to complete that mission, *Illinois v. Caballes*, 543 U.S. 405, 407 (2005), "a traffic stop does not become unreasonable merely because the officer asks questions unrelated to the initial purpose for the stop, provided that those questions do not unreasonably extend the amount of time that the subject is delayed." *United States v. Alcaraz-Arellano*, 441 F.3d 1252, 1259 (10th Cir. 2006) (quoting *United States v. Martin*, 422 F.3d 597, 601-02 (7th Cir. 2005)).  Thus "[a]s long as the [deputy's] questioning did not extend the length of the detention, ... there is no Fourth Amendment issue with respect to the content of the questions." *United States v. Wallace*, 429 F.3d 969, 974 (10th Cir. 2005); *see United States v. Stewart*, 473 F.3d 1265, 1269 (10th Cir.2007) (holding the correct Fourth Amendment inquiry assuming the detention is legitimate is whether the questions extended the time that a driver was detained, regardless of the questions' content.)

This court's examination is clear.

20

> ... we need not make a time and motion study of traffic stops; we consider the detention as a whole and the touchstone of our inquiry is reasonableness.... we must consider the individual circumstances that confronted the troopers, using "common sense and ordinary human experience" to determine whether "the police acted less than diligently, or ... unnecessarily prolonged [the] detention." *United States v. Sharpe*, 470 U.S. 675, 685, 105 S. Ct. 1568, 84 L. Ed. 2d 605 (1985).

*United States v. Patterson*, 472 F.3d 767, 776 (10th Cir. 2006).

Having reviewed the facts elicited from Trooper Taylor and the video tape, the court finds no support for defendant's contention that the stop was appreciably lengthened by questions unrelated to the stop.  Nor does the length of the seizure itself exceed the bounds of reasonableness.  Nor is there any doubt that the traffic stop ended and a consensual encounter began once Trooper Taylor returned all documentation to defendant and Baker, told defendant and his cousin that they were free to go, broke contact with the two men and then walked toward his patrol car.  Accordingly, defendant's motion to suppress shall be denied.

IT IS THEREFORE ORDERED that defendant's motion to dismiss count three of the Indictment (Dk. 14) is denied.

IT IS FURTHER ORDERED that defendant's motion to suppress evidence (Dk. 15) is denied.

Dated this 18th day of December, 2007, Topeka, Kansas.

s/ Sam A. Crow
Sam A. Crow, U.S. District Senior Judge